IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARSHA M. HUNTER, ) | |
| ) | |
| Plaintiff, ) | 4:05CV3089 |
| ) | |
| V. ) | |
| ) | |
| SOCIAL SECURITY ADMINISTRATION, ) | MEMORANDUM AND ORDER |
| ) | |
| Defendant. ) | |
| ) | |

Marsha M. Hunter ("Hunter") filed an application for supplemental security income under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381 *et seq.*, on October 10, 2002. Social Security Transcript ("Tr.") at 47. The Social Security Administration ("SSA") disapproved Hunter's claim on January 30, 2003. Tr. at 33. On February 13, 2003, Hunter filed a request for reconsideration with the SSA, and on March 18, 2003, the SSA upheld its claim denial. Tr. at 37; Tr. at 39. On April 23, 2003, Hunter filed a request for hearing by an administrative law judge ("ALJ"). Tr. at 43. The hearing commenced on May 18, 2004, and the ALJ found Hunter not disabled under the Act. Tr. at 15. The Appeals Council denied Hunter's request for review on February 12, 2005. Tr. at 7.

Hunter appeals the ALJ's finding, arguing that the ALJ failed to accord controlling weight to the limitations and restrictions imposed on Hunter by her treating physician, Dr. Ben O. Martin ("Dr. Martin"), pursuant to Social Security Ruling (SSR) 96-2p.[1] Filing No. 14. Hunter further argues that even if Dr. Martin's opinion is not entitled to controlling weight, the ALJ failed to accord Dr. Martin's opinion the greatest weight based on his

---

[1] Social Security Ruling (SSR) 96-2p provides that "[c]ontrolling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and the opinion "is 'not inconsistent' with the other substantial evidence in the case record." SSR 96-2P, 1996 WL 374188, at *1 (1996.).

examining relationship, his treatment relationship, the supportability of his opinions and the consistency with the record as a whole. Filing No. 14. Lastly, Hunter maintains the ALJ did not properly apply *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), when he evaluated Hunter's subjective allegations of her physical and mental condition regarding her limitations, restrictions and work-like activity. Filing No. 14. The Court has reviewed the record, the ALJ's evaluation and findings, the medical evidence, the parties' briefs, the transcript, and the applicable law. The Court concludes the ALJ's finding that Hunter is not disabled within the meaning of the Act is not supported by substantial evidence on the record as a whole.

**Background**

Hunter, born on February 25, 1942, was 62 years old at the time of the administrative hearing on May 18, 2004, and had completed the twelfth grade. Tr. at 209-210. Hunter is five feet, two-inches tall and weighed approximately one-hundred pounds at the time of the hearing. Tr. at 210. Hunter is right-hand dominant. *Id.* Her previous work experience includes jobs as a flagger for a construction company, telemarketer, waitress, and nursing assistant. Tr. at 211-212;124. Hunter maintains disability due to alleged arthritis in her back, emphysema, and chronic obstructive pulmonary disease ("COPD"). Tr. at 59-68.

From March 20,1982 through January 17, 2001, Hunter visited Pender Medical Clinic in Pender, Nebraska, for treatment of sore throats, upper respiratory infections, sinus infections, allergies, bronchitis, fatigue, scabies, arthritis, boils, and nausea. Tr. at 150-160. On January 17, 2001, Hunter presented at the emergency room complaining of dizziness, lightheadedness, and chills. Tr. at 149. Dr. Ben O. Martin ("Dr. Martin) diagnosed Hunter with acute bronchitis and stress-related problems. Dr. Martin told Hunter

2

that she did not have a cardiac condition and allowed her to return home. Tr. at 149. Following her emergency room visit, Hunter returned to Pender Medical Clinic for annual examinations, upper respiratory congestion, bronchitis, nasal and chest congestion, a Tetanus shot due to Hunter's metal work, a consultation regarding disability, and smoking cessation. Tr. at 146-148. In June, 2001, Dr. Martin prescribed an Azmacort inhaler to help to improve Hunter's breathing. Tr. at 163. On July 14, 2002, Hunter presented at the emergency room complaining of epigastric pain. Tr. at 145. Hunter reported that she took no medications on a regular basis, smoked, and consumed caffeine and alcohol on a regular basis. *Id.* The emergency room physician diagnosed Hunter with gastroesophageal reflux disease and prescribed an anti-ulcer medication.

Hunter presented at Pender Medical Clinic on November 21, 2002, complaining of a cough, congestion, and sore throat. Tr. at 144. Progress notes indicate that Hunter had evidence of COPD, emphysema, pharyngitis, and early bronchitis. *Id.* Hunter received medication and a referral to see a pulmonologist. *Id.*

On November 25, 2002, Dr. Craig W. Bainbridge, M.D. ("Dr. Bainbridge") of Pulmonary Associates examined Hunter at the request of the Social Security Disability Services of Nebraska. Tr. at 124. Hunter reported that she suffered from emphysema, COPD, and back pain, and told Dr. Bainbridge that she had been short of breath for two years. *Id.* Hunter stated that she had smoked for 44 years and continued to smoke one to two packs of cigarettes daily. *Id.* Hunter claimed that she had difficulty sitting still, sleeping, and breathing while sleeping, and experienced wheezing, occasional phlegm, and chest pain with deep breathing, but not with exertion. *Id.* Hunter indicated that her back pain had been consistent for three to four years, and attributed the pain to a car accident at age 16. *Id.* Hunter stated that she could not sit still or move about and that

3

bending in certain directions caused her back pain. *Id.* Dr. Bainbridge observed that Hunter had weak joints, some arthritis, and normal pulmonary functions. Dr. Bainbridge diagnosed Hunter with: dyspnea, etiology unknown with normal pulmonary function studies (95% of predicted function); tobacco abuse; chronic and continuing back pain; no restriction of hip motion noted; and probable chronic bronchitis by history. *Id.*

A State Agency Disability Determination Services ("DDS") consultant, probably by or under the direction of Dr. Glen D. Knosp ("Dr. Knosp"), completed a physical residual functional capacity assessment ("RFC") on January 30, 2003. Tr. at 134-142. The RFC listed Hunter's primary diagnosis as mild degenerative disc disease of the lumbar spine, with an alleged impairment of mild COPD. Tr. at 134. The exertional limitations listed on the RFC included: occasionally lifting and/or carrying fifty pounds, frequently lifting and/or carrying twenty-five pounds, standing and/or walking (with normal breaks) a total of about six hours in an eight-hour workday, sitting (with normal breaks) for a total of about six hours in an eight-hour workday, and unlimited pushing and/or pulling, except as shown for the lift and/or carry category. Tr. at 135. According to the RFC report, Hunter had no postural limitations, manipulative limitations, visual limitations, or communicative limitations. Tr. at 136-138. As stated in the RFC notes, Hunter needed to avoid concentrated exposure to extreme cold, extreme heat, and fumes, odors, dusts, gases, and poor ventilation. Tr. at 138.

Dr. Knosp prepared an addendum to the RFC, wherein he noted that despite acute bronchitis and emphysema, Hunter continued to smoke. Tr. at 142. Dr. Knosp noted that Hunter exhibited pulmonary function "basically within normal limits" and X-rays of the lumbar spine revealed small, marginal osteophytes consistent with mild degenerative disc disease. *Id.* Dr. Knosp reported that Hunter lacked credibility because Hunter listed

significant limitations on her Activities of Daily Living form ("ADL"), but her examination was "non-severe." *Id.*

Dr. Martin examined Hunter on February 14, 2003, and Hunter complained of shortness of breath with minimal exertion; arthritis in her back with pain when stooping, lifting, or carrying; neck and shoulder pain when carrying or being on her feet for prolonged periods of time; numbness in her right hand and tingling when she used that hand for prolonged periods of time; excess fatigue; and, leg cramps at night. Tr. at 143. Dr. Martin noted that Hunter had emphysema and diminished breath sounds. *Id.* Dr. Martin further noted in his report that Hunter applied for disability benefits and her "variety of problems" would be assessed in the future. Tr. at 143.

Dr. Martin prepared a Medical Impairment Evaluation ("MIE") dated April 1, 2003, evaluating the period of October 31, 2002, through October 31, 2003. Tr. at 162-164. Dr. Martin noted that Hunter had medically ascertainable impairments, not expected to result in death, but which were expected to last for a continuous period of at least 12 months. Tr. at 162. Dr. Martin indicated these impairments included: emphysema of moderate severity, moderately disabling for a duration of several years, and back pain of moderate severity, moderately disabling for a duration of several years. *Id.* Dr. Martin reported that these impairments rendered Hunter unable to perform her previous job or similar work. *Id.* Dr. Martin indicated that no treatments existed for Hunter's impairments. Tr. at 163. Dr. Martin noted that Hunter's symptoms included: shortness of breath with minimal exertion; back pain which prevented Hunter from standing on her feet for any length of time and which caused discomfort while lifting, stooping or doing any carrying; neck and shoulder pain; and, numbness in the right hand. *Id.* Dr. Martin indicated that Hunter lacked the ability to lift anything over 15 to 20 pounds. *Id.* Dr. Martin reported that Hunter followed

5

the treatment he prescribed and that Hunter's impairments were reasonably consistent with the symptoms and function limitations described in the questionnaire. *Id.* In response to the question regarding laboratory findings, Dr. Martin wrote that "no laboratory testing has been done." Tr. at 164. Dr. Martin indicated that Hunter suffered severe pain that "often" interfered with attention and concentration. Tr. at 163.

Dr. Martin also completed a Physical Capacities Evaluation form ("PCE form") on Hunter's behalf. Tr. at 165-167. Dr. Martin noted on the PCE form that Hunter could stand and walk for two hours in a workday with normal breaks. Tr. at 165. The PCE form provided several categories for the amount a claimant could lift. Those categories were up to ten lbs, eleven to twenty pounds, twenty-one to fifty pounds, and fifty-one to one-hundred pounds. *Id.* Dr. Martin checked the box that indicated Hunter could lift and carry up to ten pounds occasionally, and checked the boxes labeled "never" for the eleven to twenty pounds, twenty-one to fifty pounds, and fifty-one to one-hundred pounds categories. *Id.* Dr. Martin also checked the boxes providing that Hunter could reach, grasp, do fine manipulations with her fingers and use foot controls occasionally. *Id.* Dr. Martin marked the boxes labeled "seldom" regarding whether Hunter could bend, squat, crawl, climb, and reach above shoulder level. Tr. at 166. Additionally, Dr. Martin noted that Hunter could never work at unprotected heights, work around moving machinery, work exposed to marked changes in temperature and humidity, drive automotive equipment or work exposed to dust, fumes and gases. *Id.* Dr. Martin reported that Hunter would never be able to work at a rapid pace, but checked the box labeled "seldom" in reference to whether Hunter would need to perform at a slow pace. *Id.* Dr. Martin stated that Hunter would not need breaks other than scheduled ones, would not need to elevate her legs during the workday, and would not need to lie down during a work shift. *Id.*

6

On May 22, 2003, Hunter visited the emergency room complaining of cough, sore throat, and congestion. Tr. at 198. The record of this visit indicates that Hunter displayed good oximetry at 95% and definite COPD. *Id.* The record further indicates that Hunter smoked a pack of cigarettes a day and exhibited wheezing, rales, a red throat, drainage, sinus congestion, upper respiratory infection, and acute bronchitis. *Id.* Hunter received an antibiotic and antibacterial medication. *Id.* On June 17, 2003, Hunter presented at Pender Medical Clinic for a breast exam and complaining of bronchitis symptoms. Tr. at 198. The record for this visit indicates that Hunter received Doxycyline for her bronchitis, Advair Diskus for asthma, and an increase of Wellbutrin, twice daily, for tobacco abuse. *Id.* Hunter exhibited a few scattered rhonchi, a pink and clear throat, and moved her extremities well. *Id.*

Hunter visited the Pender Medical Clinic on July 15, 2003, and reported that she suffered numbness in her hands and dropped things. Tr. at 197. Dr. Martin observed that Hunter had continued smoking and exhibited a persistent cough, arthritis of the joints, and early carpal tunnel syndrome. *Id.* Dr. Martin noted that Hunter received instructions to pick up bilateral braces for her wrists if she continued to have trouble. *Id.* On August 9, 2003, Hunter presented at the Pender Medical Clinic complaining of hand and wrist pain and dizzy spells that occurred more frequently when she changed positions. Tr. at 197. Dr. Martin noted that Hunter may have experienced postural hypotension and that Hunter required an electromyogram to confirm carpal tunnel syndrome. *Id.* Hunter returned to Pender Medical Clinic on August 12, 2003, with alleged sore throat, shortness of breath, and fatigue. Tr. at 196. The record indicates that Hunter exhibited scattered rhonchi with diminished air flow and a pink, clear throat. *Id.* The clinic diagnosed Hunter with COPD

exacerbation and bronchitis, and prescribed Amoxicillin, Prednisone, and advised Hunter to continue taking Advair.  *Id.*

Electrodiagnostic studies performed on September 11, 2003, revealed that Hunter had right carpal tunnel syndrome.  Tr. at 168.  Pender Community Hospital physician's S.G. Oxford and Dr. Martin noted that Hunter exhibited right carpal tunnel syndrome with "upper degree of moderate range (with prolongation of right median motor and right median sensory distal latency across the wrist[)]."  *Id.*  At Mercy Medical Sioux City Department of Radiology, Dr. Y.T. Chung conducted an MRI of Hunter's lumbar spine on September 17, 2003.  Tr. at 169.  The MRI revealed "diffusely demonstrated mild to moderate degenerative disc disease, and hypertrophic degenerative changes of the surrounding bones and posterior elements."  *Id.*  Dr. Chung further noted no evidence existed of "abnormal focal HNP, spinal or neural foraminal stenosis" and the conus ends at the level of L1 appeared to be intact.  *Id.*  Dr. Chung found no evidence of nerve root compression.  *Id.*

On October 28 and November 25, 2003, Hunter visited the Pender Medical Clinic for treatment of bronchitis symptoms and COPD.  Tr. at 196.  Hunter complained of shortness of breath and coughing, and the reports for these visits indicate that Hunter exhibited "fair" airflow.  *Id.*  The record further reports that Hunter continued to smoke.  *Id.*  Hunter received a recommendation for increased fluids and prescriptions for Doxycycline, Combivent inhaler, Advair inhaler, Prednisone, Phenergan with codeine for cough, Depo-Medrol, and Amoxicillin.  *Id.*

Hunter presented at Pender Mercy Medical Clinic on December 4, 2003, complaining of fatigue, shortness of breath, and weakness.  Tr. at 195.  Hunter reported that she had an increased temperature and chills and difficulty breathing when she moved.

*Id.* The record for this visit indicates that Hunter "just doesn't seem to be getting any better," and appeared "in some acute distress." *Id.* Pender Community Hospital admitted Hunter on December 4, 2003, for treatment of pneumonia and asthma. Tr. at 195;171. Dr. Martin reported that Hunter had mild respiratory distress and exhibited a cough, fever, and sore throat. Tr. at 171. A chest X-ray revealed hyperinflation and no acute infiltrate. Tr. at 170. On December 5, 2003, Dr. Martin observed that Hunter appeared "better" and exhibited diminished breath sounds, low grade temperature, and "a little bit of expiratory wheezing." Tr. at 175. Dr. Martin administered a dose of Solu-Medrol and discharged Hunter from the hospital at Hunter's request due to lack of insurance. Tr. at 175;170.

Hunter returned to the hospital on December 6, 2003 complaining of symptoms relating to asthma and bronchitis that were refractory to out-patient treatment, she was getting worse. Tr. at 177. The hospital admitted Hunter and a chest X-ray showed obstructive lung disease. *Id.* Dr. Martin treated Hunter with antibiotic and respiratory medications and reduced Hunter's Prednisone and nebulizer dosages. *Id.* The hospital discharged Hunter on December 9, 2003, and reported that Hunter exhibited improved breathing and no rales or wheezing. Tr. at 179. At a post-hospitalization follow-up on December 15, 2003, Hunter stated that she "definitely [felt] better" and had discontinued smoking. Tr. at 195. The record for this visit indicates that Hunter exhibited a clear throat and occasional rhonchi. *Id.* Hunter received encouragement regarding non-smoking and advice to continue with the nebulizer. *Id.*

At the hearing before ALJ John P. Johnson on July 24, 2004, Hunter testified that she and her husband lived in a trailer house in Rosalie, Nebraska. Tr. at 233;209. Hunter stated that she had worked full-time as a flagger for a total of approximately ten or eleven months, over three or four different times. Tr. at 212. Hunter reported that she had worked

9

full-time as a telemarketer for approximately six or seven months. Tr. at 213. Hunter maintained that she stopped working as a telemarketer because of back pain from sitting for up to seven-and-a-half hours per day. *Id.* Hunter stated she suffered from coughing spells due to the dry air in the workplace, and this aggravated her asthma and emphysema. Tr. at 214. Hunter further testified that if she sat in a chair for longer than fifteen or twenty minutes, her legs started to fall asleep. Tr. at 217.

Hunter reported that she took Ibuprofen for pain, but it did not help as much as it had in the past. Tr. at 220. Additionally, Hunter stated that she used an Advair inhaler, another inhaler, and Prednisone which she used about once per month, if her breathing got very bad. Tr. at 222. Hunter reported that she had difficulty breathing due to "real hot" or "real cold" weather, dust, pollen, ragweed, mold, and animal hair allergies, and reported that she smoked a half-pack of cigarettes a day. Tr. at 232. Hunter claimed she could lift about ten pounds and she could perform household duties, like washing dishes, for about 20 minutes before needing to take a break, due to pain in her back and her hands. Tr. at 218-219. Hunter testified that she could walk a block without stopping, but then needed to catch her breath. *Id.* Hunter reported that she could work in her garden for ten or fifteen minutes at a time and work in her yard for half an hour at a time. Tr. at 223-224. Hunter stated that she could drive, and she purchased groceries and did some cooking. Tr. at 225. Hunter testified that she had difficulty preparing the evening meal and doing laundry because of difficulty breathing. Tr. at 226.

Along with their children, Hunter and her husband engaged in metal salvaging work. Tr. at 224;234. Hunter testified that she helped her husband with that work by cleaning the metals. Tr. at 224. Hunter stated that she experienced difficulty working with the metals because of hands cramps. Tr. at 225. In a typical day, from 8:00 a.m. to 5:00 p.m., Hunter

10

spent three hours standing, a half-hour at a time, and the remainder of the time either sitting in a chair with pillows or laying down. Tr. at 226. Hunter stated that she read one book per week, but if it was a good book, she "carr[ied] it around with [her]" until she completed reading the book. Tr. at 227. Hunter further stated that she watched television in the evenings. Tr. at 233. Hunter claimed she had no problem taking care of her personal needs; it just took longer for her to get moving in the morning. Tr. at 233.

     Elizabeth Albrecht ("Albrecht") testified as a vocational expert at the hearing. Tr. at 234. Albrecht created a chart that detailed Hunter's past work activities in relation to the Dictionary of Occupational Titles classification of jobs. Tr. at 237;107. In this chart, Albrecht listed the job of flagger as unskilled with "light" physical demand, and the job of telemarketer as requiring "sedentary" physical demand at a semi-skilled level. Tr. at 107. The ALJ asked Albrecht to assume a person of Hunter's same age, education, and work experience. Tr. at 238. The ALJ stated this person had degenerative joint disease of the lumbar spine, COPD with bronchitis and asthma, and carpal tunnel syndrome on the right. *Id.* The ALJ noted that this person could lift twenty pounds, ten pounds on a routine basis, walk one block at a time, and stand and walk for six hours in a eight-hour workday. *Id.* Further, this person could occasionally bend, stoop, squat, or climb; could not continuously grip, but her gross and fine manipulation remained intact; should stay away from unprotected heights; and should not be exposed to excessive heat, humidity, cold, or more than moderate levels of dust or fumes. Tr. at 238-239. Based upon this hypothetical, Albrecht testified that a person with these restrictions could not perform her past relevant work as a flagger, but could work as a telemarketer, given that there was no restriction on sitting. Tr. at 239.

11

The ALJ posed a second hypothetical question more consistent with Hunter's treating physician, Dr. Martin, which included limitations of not lifting more than ten pounds, standing for no more than ten minutes at a time, and sitting for no more than fifteen to twenty minutes at a time. *Id.* Albrecht stated that a person with these restrictions would be unable to perform as either a flagger or telemarketer. Tr. at 240. Hunter's attorney, Warren L. Rehmer, then asked Albrecht if her testimony regarding the first hypothetical question would change with the inclusion of additional limitations from Dr. Martin's MIE form. *Id.* These additions included limitations regarding ability to reach, handle, finger, and pain that interfered with attention and concentration. *Id.* Albrecht testified that if the pain and concentration interfered with job completion at a satisfactory level for a third or more of the time, an individual with these restrictions could not perform as a telemarketer. *Id.* Additionally, assuming the attorney's additions to the hypothetical question, Albrecht stated that there would be no other jobs using transferable skills from Hunter's prior work experience. *Id.*

**Legal Standard**

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant is disabled when the claimant is "not only unable to do his previous work but cannot, considering . . . his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy ... either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

An ALJ evaluates a disability claim according to a five-step sequential analysis prescribed by Social Security regulations. The ALJ examines

> any current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. See 20 C.F.R. § 404.1520(a); *Braswell v. Heckler*, 733 F.2d 531, 533 (8th Cir. 1984). If a claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. See *Braswell*, 733 F.2d at 533. If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy. See *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). A claimant's residual functional capacity is a medical question. See *id.* at 858.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000).

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). Under this standard, substantial evidence means something "less than a preponderance" of the evidence, *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998), but "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Ellison v. Sullivan*, 921 F.2d 816, 818 (8th Cir.1990). "Substantial evidence is that which a reasonable mind would find as adequate to support the ALJ's decision." *Brown v. Chater*, 87 F.3d 963, 964 (8th Cir. 1996) (citing *Baumgarten v. Chater*, 75 F.3d 366, 368 (8th Cir. 1996)).

In determining whether the evidence in the record as a whole is substantial, the court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). If the court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision because the record also contains substantial evidence that supports a different outcome or because the court would have decided the case differently. *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).

**Discussion**

**A.    ALJ's Findings**

Based on the record, the ALJ determined Hunter suffers from degenerative disc disease of the lumbar spine, COPD with chronic bronchitis and emphysema, and right carpal tunnel syndrome. Tr. at 16. The ALJ noted that Hunter's medical impairments did not meet the same or equivalent level of severity of any impairment listed in C.F.R. Part 404, Subpart P, Appendix 1.[2] The ALJ concluded that Hunter is not credible because her statements concerning her alleged impairments and functional abilities are inconsistent. Tr. at 19. The ALJ further determined that Hunter's subjective complaints are not as limiting as she alleged and are not supported by the objective medical evidence of record. *Id.* Accordingly, the ALJ found Hunter not disabled pursuant to the Social Security Act. *Id.*

Hunter argues the ALJ failed to accord controlling weight to the limitations and restrictions listed by Dr. Martin. Filing No. 14. Additionally, Hunter contends that the ALJ failed to attribute proper weight to Dr. Martin's findings based on his examining and

---

[2]The ALJ specifically noted that he considered impairments 1.04-Disorders of the Spine, and 3.03-Asthma.

treatment relationship with Hunter. *Id.* Hunter further argues that the ALJ erred in determining Hunter's credibility. *Id.*

## B. Weight of Treating Physician Opinion

Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (*quoting* 20 C.F.R. § 404.1527(d)(2) (2006). The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

The ALJ evaluated the opinions of Hunter's treating physician, Dr. Martin, which were included in the MIE form and PCE form, both dated April 1, 2003. Tr. at 19;162-167. The ALJ referred to "internal inconsistencies between the form portion of the report and the checklist." Tr. at 19. The inconsistencies are noted in the difference between the amount Hunter can lift and carry. *Compare* Tr. at 163 (establishing Hunter is unable to lift more than fifteen to twenty pounds), with Tr. at 165 (establishing Hunter can never lift or carry more than ten pounds). Apparently, the ALJ did not read both evaluations. The MIE form was a fill-in-the-blanks form in which Dr. Martin noted the claimant could not lift more than ten to fifteen pounds. Tr. at 163. Alternatively, the PCE form offered check-the-box

15

categories between up to ten pounds and eleven to twenty pounds. Tr. at 165. Dr. Martin made a clinical evaluation that his patient could not lift eleven to twenty pounds but could lift ten pounds consistent with his finding in the MIE form. The ALJ noted that Dr. Martin based his opinion that Hunter experienced disability limitations in motion on Hunter's subjective complaints. Tr. at 19. However, as the ALJ noted, the X-ray results and MRI of the lumbar spine are inconsistent with Hunter's allegations of limited mobility. *Id.* The record reflects that the X-ray revealed mild degenerative joint disease, and an MRI showed mild to moderate degenerative disc disease of the lumbar spine. Tr. at 133;169. There is no medical evidence to support the ALJ's finding. The ALJ substituted his expert opinion about the consistency of radiographic findings with Dr. Martin's findings of pain and reduced mobility. The record is silent concerning this cited inconsistency. However, the record indicates that Dr. Martin did not impose any limitations concerning sitting or the maximum hours Hunter can work in a day. He did find that Hunter had moderately disabling back pain and emphysema. *See* Tr. at 162-167;18.

Dr. Bainbridge reported normal pulmonary function studies and Dr. Knosp found Hunter "basically within normal limits." Tr. at 124;142. The ALJ noted that Hunter had not been admitted to the emergency room or the hospital more frequently over the years and that Hunter only used Prednisone once a month, when her breathing became very difficult. Tr. at 19;222. Dr. Knosp also noted that Hunter lacked credibility because Hunter reported significant limitations on her ADL form, but her examination was "non-severe." Tr. at 142.

Due to these inconsistencies, the ALJ did not allocate controlling weight to Dr. Martin's opinion, but the ALJ did include significant portions of Dr. Martin's opinion in the RFC that are supported by the record as a whole. Tr. at 19.

The Court is confused about Dr. Knosp's findings that Hunter was "basically within normal limits." Dr. Knosp found that Hunter, this 5'2", one-hundred pound woman in her early sixties was able to lift half of her body weight, fifty pounds, occasionally, and a quarter of her body weight, twenty-five pounds, frequently. Tr. at 135. Dr. Knosp found Hunter had unlimited dexterity despite Dr. Martin's documentation of carpal tunnel syndrome in Hunter's right hand. Tr. at 137; Tr. at 197; 168. In one visit, paid for by the defendant, Dr. Knosp was able to find there was nothing wrong with Hunter. The record on the whole demonstrates otherwise.

The Court does not dispute the pulmonologist's findings that Hunter's pulmonary function tests are within normal limits. However, Hunter still suffers from chronic bronchitis as evidenced by her repeated hospitalizations and office visits. Hunter also suffers from shortness of breath on exertion as demonstrated by repeated clinical examinations of her treating physician. There is no credible evidence in the record that her normal pulmonary function tests exclude these clinical findings by her treating physician.

After consideration of the entire record, the ALJ found Hunter has the residual functional capacity to

> ...lift and/or carry up to 20 pounds occasionally, ten pounds frequently, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday, occasionally bend, stoop, squat, climb. She is unable to continuously grip but her gross and fine manipulation is intact. She cannot perform work at unprotected heights, or in temperature extremes, dust or fumes.

*Id.*

This Court observes that this finding by the ALJ is not only unsupported by Dr. Martin's findings, but it does not comport with Dr. Knosp's conclusion that Hunter's examination was "non-severe" and "basically within normal limits." Tr. at 142. The Court

17

further finds that the evidence in the record does not support the Dr. Knosp's (or the DDS consultant likely under the direction of Dr. Knosp) determination that Hunter can lift/carry fifty pounds occasionally, twenty-five pounds frequently, stand and/or walk six hours with breaks during an eight-hour workday, and sit continuously with breaks for six hours in an eight-hour workday.  Tr. at 134-142.  Given this Court's assessment of the record as a whole, the ALJ did not accord appropriate weight to Dr. Martin's findings.

**C.  Hunter's Credibility**

The ALJ questioned Hunter's credibility because of inconsistencies in the record. An adjudicator must give full consideration to all of the evidence related to subjective complaints, including: claimant's prior work record and observations by third parties and treating and examining physicians relating to claimant's daily activities; duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole."  *Id*.

In addition to the inconsistencies listed above in Subpart B relating to the weight of Dr. Martin's opinion, the ALJ found that Hunter's allegations of limitation due to hand and foot numbness and limited back mobility are inconsistent with her testimony that she performed household chores such as gardening, yard work, cooking, and shopping.  Tr. at 19; 74;223-226.  The ALJ determined that the record supports the conclusion that Hunter is unmotivated to work and Hunter's subjective complaints are not as limiting as alleged.  Tr. at 19.  The ALJ determined that Hunter is capable of performing her past relevant work as a telemarketer.  Tr. at 20.  According to Albrecht's testimony, telemarketing is sedentary, semi-skilled work.  Tr. at 20;107.  The ALJ relied on Albrecht's

18

testimony in arriving at his finding that Hunter is not precluded by her medically determinable impairment to work as a telemarketer. Tr. at 20. Because the ALJ concluded that Hunter is able to perform her past relevant work, the ALJ did not have to consider whether Hunter's impairment prevented her from doing other work which exists in significant numbers in the national economy. Tr. at 20;16.

This Court finds, based upon the complete record including Dr. Martins findings and the supporting hypothetical opinion of Ms. Albrecht, that the "inconsistencies" and lack of credibility noted by the ALJ are irrelevant and Hunter's impairments are sufficiently severe to render her disabled under 42 U.S.C. §§ 401 *et seq*. The subjective evaluation by the ALJ concerning Ms. Hunter's motivation is hardly supported by the record. She has worked her entire adult life until the progressive conditions noted by her treating physician rendered her incapable of work. Her reported ADL are indeed consistent with the medical record. After viewing the record as a whole, this Court reverses the ALJ's determination that Hunter is not eligible for Supplemental Security Income payments.

THEREFORE, IT IS ORDERED that the findings and conclusions of the ALJ are reversed and judgement is entered accordingly. A separate judgment will be entered in accordance with this memorandum and order.

DATED this 28th day of September, 2006.

BY THE COURT:

s/Joseph F. Bataillon
United States District Judge